# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ESTATE OF HIMOUD SAED ABTAN, *et al*., | ) |
|  | ) |
| Plaintiffs, | ) Case No. 07-cv-1831 (RBW) |
| v. | ) |
|  | ) |
| BLACKWATER WORLDWIDE, *et al*., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

Blackwater has been destroying documents and other tangible evidence relating to the September 16, 2007, massacre in Nisoor Square, Iraq. This conduct constitutes tortious spoliation of evidence. The plaintiffs (both living victims of the massacre and the estates of the murdered victims) therefore seek leave from the Court under Rules 15(a) and 18(a) of the Federal Rules of Civil Procedure to file an amended complaint setting forth a spoliation claim as an additional count and grounds for damages. A proposed Order granting leave for the filing and the proposed Third Amended Complaint are attached.

The parties have met and conferred, but Blackwater refuses to consent to the victims' motion for leave to amend.

 _/s/ Susan L. Burke_____

Susan L. Burke (D.C. Bar # 414939)
William T. O'Neil (D.C. Bar # 426107)
Katherine R. Hawkins
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
Telephone:    (215) 971-5058
Facsimile:    (215) 482-0874

Michael A. Ratner
Katherine Gallagher
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:    (212) 614-6455
Facsimile:    (212) 614-6499

Shereef Hadi Akeel
AKEEL & VALENTINE, P.C.
401 South Old Woodward Avenue
Suite 430
Birmingham, MI 48009
Telephone:    (248) 594-9595
Facsimile:    (248) 594-4477

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF HIMOUD SAED ABTAN, *et al*., | ) |
| | ) |
| Plaintiffs, | ) Case No. 07-cv-1831 (RBW) |
| v. | ) |
| | ) |
| BLACKWATER WORLDWIDE, *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**

Subsequent to filing the Second Amended Complaint, undersigned counsel learned from former Blackwater employees and contractors that Blackwater engaged in the deliberate destruction of documents and other physical evidence.[1]  Accordingly, Plaintiffs' motion seeks to amend the complaint to add a claim for spoliation of evidence.  Given that discovery has not yet commenced, the proposed amendment will not prejudice Blackwater in any way.

---

[1] Upon receiving the allegations of spoliation on March 18, 2008, victims' counsel immediately contacted Blackwater counsel by both email and telephone.  Blackwater counsel looked into the matter, and subsequently claimed all appropriate steps to prevent destruction of evidence had been taken.  Victims' counsel wanted information about the details of what had been done to preserve evidence, and wanted to be able to depose a limited number of witnesses thought to have first-hand knowledge.  When Blackwater counsel raised a concern about publicity, victims' counsel offered to resolve this issue outside the public domain.  Blackwater opted not to accept that offer.  Victims' counsel contemplated and discussed with Blackwater counsel filing a motion to expedite discovery, but, upon Blackwater's refusal to consent to such a motion, determined the most appropriate manner to proceed was to amend the complaint and seek discovery immediately upon the commencement of the overall discovery period.

## STATEMENT OF ALLEGATIONS

Based on information and beliefs provided by former Blackwater employees and contractors, the following acts occurred:

(1) ***Destruction of physical evidence relating to the Nisoor Square massacre***

In the normal course of business, Blackwater vehicles were frequently damaged and needed repainting.  Blackwater routinely sent its vehicles to another company (believed to be Kellogg Brown Root) for repainting; Blackwater did not conduct the repainting itself.

Departing from this normal course of business, immediately subsequent to the September 16, 2007, massacre, Blackwater obliterated crucial evidence by deliberately and intentionally repainting the vehicles involved in the shooting.  Blackwater knew (or clearly should have known) that a direct examination of these vehicles in their original state would be needed during the investigation of the September 16, 2007 massacre. There was no business need or rationale for such immediate repainting.  There was no shortage of operational Blackwater vehicles in Iraq.  Further, there was no shortage of funds to procure additional operational vehicles if the State Department urgently requested vehicles over and above the number already in Iraq.  But the State Department made no such urgent request.  By so departing from its normal course of business and repainting the Nisoor Square vehicles immediately for no business reason, Blackwater intentionally destroyed critical evidence.

Blackwater's counsel has indicated that Blackwater intends to defend itself by introducing self-serving Blackwater-created photographs that display holes in the vehicles. Blackwater's spoliation of evidence eviscerates the victims' ability to examine the vehicles and establish for the jury the state of the vehicles on September 16, 2007, or the reasons for their

state. Specifically, it will never be known whether any damage was actually done to the vehicles. Further, even assuming the vehicles were damaged, it will never be known the precise type of damage or cause of damage. For example, counsel has been advised by persons with knowledge that Blackwater shooters involved in the massacre kept prohibited grenades in their vehicles, and that one shooter inadvertently "fragged" his own vehicle with a grenade. But it is now impossible to examine the vehicles to determine if the damage (if any) is consistent with being fragged with a grenade.

### (2) Shredding of documents

On or before March 18, 2008, Blackwater executives Gary Jackson and Dave Jackson, as well as unknown others, met in Blackwater's North Carolina compound to discuss the company's legal exposures arising from the ongoing governmental investigations. (Blackwater is under criminal investigation by the United States Attorneys in both the District of Columbia and North Carolina.) During that meeting, Blackwater executives directed that documents be shredded. After that meeting, Blackwater employees shredded an unknown number of documents that related to the company's criminal and civil legal exposures.

### ARGUMENT

Plaintiffs' motion to amend to add the tort of spoliation at this early juncture should be granted. Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be "freely given when justice so requires." Although Blackwater likely will dispute the allegations made by plaintiffs, "[i]f the underlying facts or circumstances relied on by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim." *Foman v. Davis*, 371 U.S. 178, 182 (1962). As the Supreme Court teaches in *Forman*, leave to amend should be granted in the absence of adverse factors such as undue delay, bad faith, prejudice to the

defendants, or futility of the amendment.  *See also Sinclair v. Kleindienst*, 645 F.2d 1080, 1085

(D.C. Cir. 1981) ("Only limited circumstances justify a district court's refusal to grant such leave

to amend: undue delay, bad faith on the part of the moving party, or undue prejudice to the

opposing party.")

      None of those factors is present here.  ***First***, there has been no undue delay or bad faith.

Plaintiffs first learned of the various facts relating to the shredding of evidence on or after March

18, 2008.  Thereafter, victims' counsel conducted additional investigation and interviews to

obtain as much information about both the shredding of the documents and the repainting of the

vehicles as was possible without the benefit of formal discovery.  Simultaneous with that

investigation, victims' counsel sought (unsuccessfully) to persuade Blackwater to participate

voluntarily in a limited amount of discovery.   When those negotiations proved fruitless, victims'

counsel moved forward with this motion.  ***Second***, such an amendment does not prejudice

Blackwater because Blackwater has not yet answered the Second Amended Complaint, and

discovery has not yet begun.  ***Third***, the amendment is not futile because the District of

Columbia permits the pleading of an independent tort for spoliation of evidence.  *See Holmes v.*

*Amerex Rent-A-Car*, 180 F.3d 294, 295 (D.C. Cir. 1999) (quoting *Holmes v. Amerex Rent-A-Car*,

710 A.2d 846 (D.C. 1998); *see also Krieger v. U.S. Dep't of Justice*, 529 F.Supp.2d 29, 60-61

(D.D.C. 2008) (describing elements of cause of action for spoliation of evidence).

      Accordingly, the victims respectfully request that the Court should grant their motion for

leave to amend.

            _/s/ Susan L. Burke_____
           Susan L. Burke (D.C. Bar # 414939)
           William T.  O'Neil (D.C. Bar # 426107)
           BURKE O'NEIL LLC
           4112 Station Street

Philadelphia, PA 19127
Telephone:      (215) 971-5058
Facsimile:      (215) 482-0874


Michael A. Ratner
Katherine Gallagher
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:      (212) 614-6455
Facsimile:      (212) 614-6499

Shereef Hadi Akeel
AKEEL & VALENTINE, P.C.
401 South Old Woodward Avenue
Suite 430
Birmingham, MI 48009
Telephone:      (248) 594-9595
Facsimile:      (248) 594-4477

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Estate of Himoud Saed Abtan et al., | ) ) ) |
| Plaintiffs, | ) ) Case No. 1:07-cv-01831 (RBW) |
| v. | ) ) |
| Blackwater Lodge and Training Center, Inc. et al. | ) **JURY DEMAND** ) |
| Defendants. | ) ) ) |

## THIRD AMENDED COMPLAINT

1.       This action is being brought against the individual and corporate entities who operate under the name "Blackwater." Blackwater in all of its various corporate incarnations is actually a single private company wholly owned and personally controlled by a man named Erik Prince. Blackwater earns billions of dollars selling mercenary services.

2.       On September 16, 2007, heavily-armed Blackwater mercenaries (known in Blackwater parlance as "shooters") working in Iraq began firing on a crowd of innocent civilians without justification, resulting in multiple deaths and injuries. Six Plaintiffs (Himoud Saed Abtan, Usama Fadhil Abbass, Oday Ismail Ibraheem, Dr. Mahasin Mohson Kadhum, Ahmed Hathem Al-Rubaie and Ali Khaleel) were among those killed in this massacre; eleven others (Talib Mutlaq Deewan, Abdulwahab Abdulqadir Al-Qalamchi, Mahdi Abdulkhudhir Abbass, Sami Hawas Hamood, Fereed Waleed Hassoon, Bara'a Sa'adoon Ismael, Sameer Hoobi Jabbar, Abdulameer Rahmeen Jehan, Mahammed Hassan Mahammed, Haider Ahmed Rabe'a and Hassan Jabir Salman) were among those seriously injured. This senseless slaughter on

September 16, 2007, was only the latest incident in Blackwater's lengthy pattern of egregious misconduct in Iraq.

3.     Blackwater created and fostered a culture of lawlessness amongst its employees, encouraging them to act in the company's financial interests at the expense of innocent human life.  This action seeks compensatory damages to compensate the injured and the families of those gunned down and killed by Blackwater shooters.  This action seeks punitive damages in an amount sufficient to punish Erik Prince and his Blackwater companies for their repeated callous killing of innocents.

**PARTIES**

4.     Plaintiff is the Estate of Himoud Saed Abtan.  Mr. Abtan was a resident of Baghdad until he was shot to death by Blackwater shooters on September 16, 2007.   He was the father of three boys, four daughters, including a newborn baby daughter.

5.     Plaintiff is the Estate of Usama Fadhil Abbass.  Mr. Abbass was a resident of Baghdad until he was shot to death by Blackwater shooters on September 16, 2007.   He was the father of four children, two boys and two girls.

6.     Plaintiff is the Estate of Oday Ismail Ibraheem.  Mr. Ibraheem was a resident of Baghdad until he was shot to death by Blackwater shooters on September 16, 2007.   He was the father of three children, one boy and two girls.

7.     Plaintiff is the Estate of Ali Khaleel. Ali Khaleel was a 55 year old resident of Baghdad until he was shot to death by Blackwater shooters on September 16, 2007. He was the father of four sons and two daughters.

8.     Plaintiff Talib Mutlaq Deewan is a Baghdad resident who was seriously injured by Blackwater shooters on September 16, 2007.   He is the father of three boys and one daughter.

9.      Plaintiff Abdulwahab Abdulqadir Al-Qalamchi is a Baghdad resident who was seriously injured by Blackwater shooters on September 16, 2007.

10.     Mahdi Abdulkhudhir Abbass is a 42 year old Baghdad resident who was seriously injured by Blackwater shooters when shot in the shoulder and hand on September 16, 2007. He is the father of three sons and three daughters.

11.     Sami Hawas Hamood is a 43 year old Baghdad resident who was seriously injured by Blackwater shooters when shot twice in the back and in the leg on September 16, 2007. He is the father of two sons and three daughters.

12.     Fereed Waleed Hassoon is a 41 year old Baghdad resident who was seriously injured by Blackwater shooters when shot in the neck, chest and waist on September 16, 2007. He is the father of three children, including a baby daughter.

13.     Bara'a Sa'adoon Ismael is a 28 year old Baghdad resident who was seriously injured by Blackwater shooters when shot in the waist and the leg on September 16, 2007. He is the father of two daughters.

14.     Sameer Hoobi Jabbar is a 41 year old Baghdad resident who has injured when a Blackwater vehicle hit his car on September 16, 2007. He is the father of one son.

15.     Abdulameer Rahmeem Jehan is a 48 year old Baghdad resident who was seriously injured by Blackwater shooters when shot three times in the leg as tried to jump out of a minibus.  He is the father of one son and one daughter.

16.     Mohammed Hassan Mohammed is a 30 year old Baghdad resident who suffered injuries to his leg when throwing himself from his car to escape Blackwater gunfire. He is the father of one son.

17.     Haider Ahmed Rabe'a is a 32 year old Baghdad resident who was seriously injured by Baghdad shooters when shot in both legs while trying to flee from his car to escape the gunfire. He is the father of one daughter.

18.     Hassan Jabir Salman is a 46 year old Baghdad resident and lawyer who was seriously injured by Baghdad shooters when shot in both shoulders and the back of the neck. He is the father of three daughters and five sons.

19.     Erik Prince, a resident of McLean, Virginia, with business offices at 1650 Tysons Boulevard, McLean, Virginia, 22102, personally and wholly owns holding companies known as The Prince Group and EP Investments LLC.  Mr. Prince, through these holding companies, owns and controls the various Blackwater entities, as well as entities known as Greystone and Total Intelligence.

20.     Defendant The Prince Group LLC is a holding company located at 1650 Tysons Boulevard, McLean, Virginia, 22102.

21.     Defendant EP Investments, LLC, is a holding company managed by the Prince Group, LLC.   EP Investments, LLC is located at  1650 Tysons Boulevard, McLean, Virginia, 22102.

22.     Erik Prince, acting through a web of companies operating under the "Blackwater" or "Greystone" or "Total Intelligence" names, earns billions of dollars providing mercenaries (known as "shooters") for hire.  Reasonable discovery will establish that these many entities do not operate with independence, but rather are all owned and personally controlled by Erik Prince acting through the vehicle of The Prince Group LLC and/or EP Investments, LLC.

23.     Blackwater Lodge and Training Center, Inc., Blackwater Target Systems, Blackwater Security Consulting and Raven Development Group are all located at 850 Puddin Ridge Road, North Carolina, 27958.

24.     Defendant Greystone Ltd. and Total Intelligence Solutions LLP are companies through which Erik Prince conducts his mercenary business.  Greystone Ltd. and Total Intelligence Solutions LLP are located at 1650 Tysons Boulevard, McLean, Virginia, 22102.

25.     Blackwater and its related entities are registered to do business in Delaware, Michigan, Virginia, Louisiana, North Carolina, Georgia, Texas, Connecticut, Florida, Montana, and California.

26.     Reasonable discovery will establish that Erik Prince and his web of wholly-owned companies routinely conduct business and enter into contracts in this District. Reasonable discovery will establish that Erik Prince and his web of wholly-owned companies earn substantial sums doing business in this District.

## JURISDICTION AND VENUE

27.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); and 28 U.S.C. § 1367 (supplemental jurisdiction).

28.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(3) and § 1391(b)(2).

## BLACKWATER KILLED AND INJURED PLAINTIFFS AND OTHER INNOCENT BYSTANDERS ON SEPTEMBER 16, 2007

29.     Blackwater provides armed forces to protect Department of State personnel in Iraq.  These mobile armed forces that accompany diplomats and others in need of protection are consistently referred to by Blackwater management and employees as "shooters."

30.    On or about September 16, 2007, Blackwater shooters shot without justification and killed multiple innocent civilians, including Himoud Saed Abtan, Usama Fadhil Abbass, Oday Ismail Ibraheem Dr. Mahasin Mohson Kadhum, Ahmed Hathem Al-Rubaie, and Ali Khaleel in and around a traffic circle known as Nisoor Square.

31.    On or about September 16, 2007, Blackwater shooters shot without justification at and injured multiple innocent civilians, including Talib Mutlaq Deewan, Abdulwahab Abdulqadir Al-Qalamchi, Mahdi Abdulkhudhir Abbass, Sami Hawas Hamood, Fereed Waleed Hassoon, Bara'a Sa'adoon Ismael, Sameer Hoobi Jabbar, Abdulameer Rahmeem Jehan, Mahammed Hassan Mahammed, Haider Ahmed Rabe'a and Hassan Jabir Salman in and around the same location.

32.    According to United States military and criminal investigators, none of the civilians was armed or taking offensive actions against the Blackwater shooters.

33.    As stated by a United States military official on site in Iraq, Blackwater's conduct "was obviously excessive, it was obviously wrong."

34.    At the time of the shooting and killings in Nisoor Square, Blackwater shooters were not protecting any State Department official.  The Blackwater shooters had already dropped off the State Department official under its protection prior to arriving in Nisoor Square.

35.    Reasonable discovery will establish that, after Blackwater shooters dropped off the State Department official they were guarding, the Tactical Operations Center (manned by both Blackwater and Department of State personnel) ("TOC"), expressly directed the Blackwater shooters to stay with the official and refrain from leaving the secure area.  Reasonable discovery will establish that the Blackwater shooters ignored these directives from the TOC.  Reasonable

discovery will establish that Blackwater personnel were obliged to follow directives from the TOC.

36.    Blackwater shooters had no legitimate reason to open fire on a crowd of innocent civilians.   Blackwater shooters began firing without any provocation.

37.    One of Blackwater's own shooters tried to stop his colleagues from indiscriminately firing upon the crowd of innocent civilians but he was unsuccessful in his efforts.

38.    Blackwater is responsible for the actions of its heavily-armed shooters acting in Iraq.  The identities of the Blackwater shooters who killed and injured innocent persons on September 16, 2007, are known to Blackwater and able to be discovered in this litigation.

## BLACKWATER PERMITS AND ENCOURAGES EXCESSIVE AND UNNCESSARY USE OF DEADLY FORCE

39.    Blackwater has a pattern and practice of recklessness in the use of deadly force.

40.    Blackwater has created and fostered a corporate culture in which excessive and unnecessary use of deadly force by its employees is not investigated or punished in any way.

41.    Blackwater routinely sends heavily-armed "shooters" into the streets of Baghdad with the knowledge that some of those "shooters" are chemically influenced by steroids and other judgment-altering substances.  Reasonable discovery will establish that Blackwater knew that 25 percent or more of its "shooters" were ingesting steroids or other judgment-altering substances, yet failed to take effective steps to stop the drug use.  Reasonable discovery will establish that Blackwater did not conduct any drug-testing of its "shooters" before sending them equipped with heavy weapons into the streets of Baghdad.

42.     An Army lieutenant colonel serving in Iraq made the following statement about Blackwater forces to a Washington Post reporter:  "They are immature shooters and have very quick trigger fingers.  Their tendency is to shoot first and ask questions later."

43.     Another senior United States commander serving in Iraq made the following statement about Blackwater forces to Washington Post reporter:  "They often act like cowboys over here,. . .  not seeming to play by the same rules everyone else tries to play by."   He further stated that they have a "record of recklessness."

44.     Blackwater produced to the Congressional Committee on Oversight and Government Reform ("the Committee") approximately 437 internal "incident reports" that reveal that Blackwater forces in Iraq consistently use excessive and unnecessary force that results in unnecessary deaths and property damage.

45.     Blackwater forces consistently and routinely engage in the preemptive and offensive, rather than defensive, use of lethal force.  Blackwater's own incident reports reveal that Blackwater forces fire first in 84 percent of the self-reported incidents involving gunfire.

46.     A few examples of Blackwater's recklessness suffice:  On or about December 24, 2006, Blackwater killed the bodyguard of Iraqi Vice President Adil Abd-al-Mahdi.   Blackwater killed the bodyguard by firing multiple shots from a Glock 9 mm pistol directly at him.   The New York Times reported that the Blackwater employee who killed the bodyguard is named Andrew J. Moonen.

47.     On or about October 24, 2005, Blackwater forces shot and likely killed an innocent civilian bystander.  Blackwater forces did not even stop to ascertain whether he had been killed.

48.     On or about June 25, 2005, Blackwater forces killed an innocent person standing on the side of the street by shooting him in the chest.  He was the father of six children. Blackwater initially failed to report the shooting, and subsequently tried to cover it up.

49.     On or about September 9, 2007, Blackwater employees shot and killed five innocent civilians including Ali Hussamaldeen Ibraheem Al-Bazzaz and Kadhum Kayiz Aziz in and around Al-Wathba Square in Baghdad.  Numerous other innocent civilians were injured in this shooting.

50.     Reasonable discovery is likely to produce evidence of additional killings by Blackwater shooters.  Reasonable discovery is also likely to produce evidence that Blackwater on one or more occasions attempted to cover up its shooters' killings by offering to pay modest sums to the families of those Iraqis whom Blackwater shooters shot for no reason.

51.     The Blackwater reports produced to the Committee reveal that Blackwater shooters in Iraq repeatedly and frequently fire shots from moving vehicles without stopping to see if Blackwater has killed anyone.

52.     The Blackwater reports produced to the Committee reveal that Blackwater shooters and other employees repeatedly fail to report wrongful use of force, and consistently lie about excessive uses of force.

53.     Reasonable discovery will establish that Blackwater significantly and consistently underreports excessive use of force by its employees in its own documentation.  Two former Blackwater employees told a Washington Post reporter that the Blackwater documents produced to the Committee significantly underreported the actual number of shootings.  One of these former Blackwater shooters stated that his 20-person team in Iraq averaged four to five shootings per week.

54.     Blackwater profits financially from its pattern and practice of misuse of deadly force.

55.     Reasonable discovery will establish Blackwater heavily markets the fact that it has never had any American official under its protection killed in Iraq.  Reasonable discovery will establish that Blackwater views its willingness to kill innocent people as a strategic advantage setting Blackwater apart and above other security companies.

56.     Reasonable discovery will establish Blackwater was and is willing to kill innocent bystanders in order to preserve that "no death" statistic for marketing purposes.   Blackwater benefits financially from its willingness to kill innocent bystanders.

## BLACKWATER HIRES INDIVIDUALS
## KNOWN TO BE CRIMINALS

57.     Blackwater, in addition to hiring persons known (or should have been known) to use steroids and other judgment-altering drugs, has been hiring as mercenaries former military officials known to have been involved in human rights abuses in Chile.  As reasonable discovery will establish, Blackwater knows that the former Chileans commandos hired by Blackwater received amnesty from punishment for their wanton disregard of human rights in exchange for being forbidden from taking part in any military or security activities in Chile.

58.     Reasonable discovery is also likely to reveal that Blackwater has been hiring mercenaries from the Philippines, Chile, Nepal, Colombia, Ecuador, El Salvador, Honduras, Panama, Peru, Bulgaria, Poland, Romania, Jordan and perhaps South Africa. Reasonable discovery is likely to reveal that Blackwater hired foreign nationals without regard for the fact that they were forbidden by the laws of their country from serving as mercenaries.

59.     Blackwater retains a sufficient number of mercenaries to be able to provide any willing buyer with a private army.

60.    In 2003, Blackwater president Gary Jackson stated publicly Blackwater's vision: "I would like to have the largest, most professional private army in the world."

61.    In March 2006, during a conference held in Amman, Jordan, Blackwater executive Cofer Black publicly declared that Blackwater was able to deploy a private brigade-sized force to any conflict or crisis zone.

## BLACKWATER ACTIONS HARM THE UNITED STATES

62.    Secretary of Defense William Gates has publicly announced that private mercenary companies, including Blackwater, are interfering with the military's ability to retain trained soldiers because the companies entice soldiers to leave military service with offers of higher pay.

63.    Blackwater's actions on September 16, 2007, are being investigated by the United States Department of Justice, United States Federal Bureau of Investigation and the Iraqi government.

64.    Blackwater's actions on September 16, 2007, have created serious and substantial difficulties for the United States' diplomatic relationship with Iraq.

65.    Although Blackwater holds itself out as cooperating with the ongoing investigations, Blackwater initially refused to permit the United States military any access to its employees and compound after the September 16, 2007, killings.

66.    Blackwater is being investigated by Congressional Committee on Oversight and Government Reform.

67.    Blackwater is being investigated by the United States Attorney, Department of Justice, North Carolina.  According to press reports, Blackwater is being investigated for having

been involved in smuggling weapons into Iraq, which subsequently ended up in the hands of persons designated as terrorists by the United States government.

68.     Two Blackwater employees have plead guilty to possessing stolen weapons. These Blackwater employees agreed to cooperate with the United States in investigation of these crimes.

69.     Blackwater is harming the United States by its repeated and consistent failure to act in accord with the law of war, the laws of the United States, and international law.

70.     Blackwater has earned more than one billion dollars (approximately $1,024,519,018) from the United States during the years 2001 to 2006.  Reasonable discovery is likely to establish that Blackwater continues to earn millions of dollars in revenue from the United States.

71.     The United States paid Blackwater these substantial sums based on Blackwater's misrepresentations that it was a legitimate company able to conduct itself in a lawful manner. But in fact, Blackwater operates extra-legally, providing heavily-armed mercenaries who flout the laws of this nation and the host nation, Iraq.

72.     Blackwater encourages and fosters a culture of lawlessness amongst its employees.

73.     Blackwater's actions and omissions resulted in unnecessary carnage and harmed the reputation of the United States throughout the world.

## BLACKWATER DOES NOT HAVE A VALID CONTRACT WITH THE UNITED STATES

74.     The Anti-Pinkerton Act, 5 U.S.C. § 1803, prohibits the United States from doing business with "[a]n individual employed by the Pinkerton Detective Agency, or similar

organization." The legislative history of the Act makes it clear that a "similar organization"

means any mercenary or quasi-mercenary organization.

75.     Blackwater constitutes such a "similar organization" and therefore lacks any valid

contractual relationships with the United States.

## ERIK PRINCE OPERATES AND CONTROLS THE VARIOUS BLACKWATER ENTITIES AS HIS ALTER EGOS

76.     Erik Prince and Al Clark jointly founded Blackwater. However, reasonable

discovery will establish that Al Clark departed Blackwater in 2000 because Erik Prince was not

willing to maintain reasonable standards of professionalism.

77.     Reasonable discovery is also likely to establish that subsequent to Al Clark's

departure, Erik Prince assumed complete and total control over Blackwater's operations.

78.     Reasonable discovery is likely to establish that the various Blackwater corporate

entities were formed merely to reduce legal exposures and do not operate as individual and

independent companies outside the control of Erik Prince.

79.     Reasonable discovery is likely to establish that the Prince Group LLC was formed

merely to shield Erik Prince from any legal and financial consequences for his reckless

indifference to the laws of this and other nations.

## INTENTIONAL DESTRUCTION OF PHYSICAL EVIDENCE

80.      Reasonable discovery is likely to establish that in the normal course of business,

Blackwater vehicles were frequently damaged and needed repainting. Blackwater routinely sent

its vehicles to another company (believed to be Kellogg Brown Root) for repainting; Blackwater

did not conduct the repainting itself.

81.      Reasonable discovery is likely to establish that Blackwater departed from this

normal course of business, immediately subsequent to the September 16, 2007, massacre.

82. Reasonable discovery is likely to establish that Blackwater obliterated crucial evidence by deliberately and intentionally repainting the vehicles involved in the shooting.

83. Reasonable discovery is likely to establish that Blackwater knew (or clearly should have known) that a direct examination of these vehicles in their original state would be needed during the investigation of the September 16, 2007 massacre.

84. Reasonable discover is likely to establish that there was no business need or rationale for such immediate repainting.

85. Reasonable discovery is likely to establish that there was no shortage of operational Blackwater vehicles in Iraq nor any shortage of funds to procure additional operational vehicles if the State Department urgently requested vehicles over and above the number already in Iraq.

86. Reasonable discovery is likely to establish that the State Department did not urgently request additional vehicles.

87. Reasonable discovery is likely to establish that, by so departing from its normal course of business and repainting the Nisoor Square vehicles immediately for no business reason, Blackwater intentionally destroyed critical evidence.

88. Reasonable discovery is likely to establish that the Blackwater's destruction of physical evidence eviscerates the victims' ability to examine the vehicles and establish for the jury the state of the vehicles on September 16, 2007.

89. Blackwater's spoliation of the evidence eviscerates the victims' ability to establish for the jury the reasons for the vehicles' physical state.

90. Reasonable discovery is likely to establish that on or before March 18, 2008, Blackwater executives Gary Jackson and Dave Jackson, as well as others, met in Blackwater's

North Carolina compound to discuss the company's legal exposures arising from the ongoing governmental investigations.

91.    Reasonable discovery is likely to establish that during that meeting, Blackwater executives directed that documents be shredded.

92.    Reasonable discovery is likely to establish that, after that meeting, Blackwater employees shredded an unknown number of documents that related to the company's criminal and civil legal exposures.

93.    Reasonable discovery is likely to establish that the shredding of documents negatively impacts the victims' ability to litigate their claims.

## DAMAGES

94.    Defendants are liable for killing Himoud Saed Abtan, Usama Fadhil Abbass, Oday Ismail Ibraheem, and Ali Khaleel. Defendants are liable for the pain and suffering caused to these victims, as well as the pain and suffering and loss of consortium caused to the family members of these victims.

95.    Defendants are liable for the physical and mental injuries caused to Plaintiffs Talib Mutlaq Deewan, Abdulwahab Abdulqadir Al-Qalamchi Mahdi Abdulkhudhir Abbass, Sami Hawas Hamood, Fereed Waleed Hassoon, Bara'a Sa'adoon Ismel, Sameer Hoobi Jabbar, Abdulameer Rahmeem Jehan, Mahammed Hassan Mahammed, Haider Ahmed Rabe'a and Hassan Jabir Salman.

96.    Defendants are liable for the intentional spoliation of evidence.

97.    Plaintiffs seek compensatory and punitive damages in an amount for each individual in excess of the jurisdictional amount set forth in 28 U.S.C. § 1332.  Plaintiffs also seek any and all additional remedies (such as attorneys' fees) available under law and equity.

## COUNT ONE
## CLAIM UNDER THE ALIEN TORT STATUTE – WAR CRIMES

98.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

99.    Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and constitute war crimes.

100.    Defendants' acts took place during a period of armed conflict.

101.    Defendants committed war crimes against Plaintiffs.

102.    Defendants are liable for their conduct that constitutes war crimes.

103.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiffs.

## COUNT TWO
## ASSAULT AND BATTERY

104.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

105.    Defendants unlawfully intended to and did inflict immediate injury upon Plaintiffs.

106.    Defendants intentionally assaulted, battered, and made other offensive contacts; and aided and abetted the assaulting, battering and offensively contacting, of the Plaintiffs.

107.    Plaintiffs did not consent to the offensive contacts. Plaintiffs feared for their personal safety and felt threatened by Defendants' actions.

108.    Defendants committed the assaults and batteries.

109.    Defendants' acts caused grave and foreseeable damages to Plaintiffs.

## COUNT THREE
## WRONGFUL DEATH

110.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

111.    Defendants' wrongful acts and omissions caused the death of Oday Ismail Ibraheem, Himoud Saed Abtan, Usama Fadhil Abbass and Ali Khaleel.

112.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to act in the manner that led to the wrongful deaths.

113.    The deaths of Oday Ismail Ibraheem, Himoud Saed Abtan, Usama Fadhil Abbass, and Ali Khaleel and other persons were the foreseeable result of Defendants' wrongful acts and omissions.

## COUNT FOUR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

115.    Defendants intentionally inflicted severe emotional distress by way of extreme and outrageous conduct on Plaintiffs and their family members.  Defendants intended or recklessly disregarding the probability that Plaintiffs would suffer emotional distress when directing offensive conduct toward Plaintiffs or carrying out offensive conduct while aware of Plaintiffs' and their family members' presence.

116.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to inflict emotional distress on Plaintiffs.

- 17 -

117.   Defendants' acts caused grave and foreseeable injuries to Plaintiffs and their family members.

## COUNT FIVE
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

118.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

119.   Defendants negligently inflicted severe emotional distress on Plaintiffs and their family members.

120.   Defendants breached a duty to Plaintiffs and others present at the scene of the killings and infliction of bodily injury.

121.   Defendants' negligence directly and foreseeably harmed Plaintiffs.

## COUNT SIX
## NEGLIGENT HIRING, TRAINING AND SUPERVISION

122.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

123.   Defendants acted negligently and directly harmed Plaintiffs by:

(a)   failing to take the appropriate steps in hiring proper personnel to perform services;

(b)   failing to properly screen personnel before their hiring;

(c)   failing to train personnel properly;

(d)   failing to investigate allegations of wrongdoing;

(e)   failing to reprimand for wrongful actions;

(f)   failing to adequately monitor for and stop illegal substance abuse; and

(g)   negligently permitting repeated lawlessness by employees.

124.    Defendants' negligence directly and foreseeably harmed Plaintiffs and their family members.

**COUNT SEVEN**
**TORTIOUS SPOLIATION OF EVIDENCE**

125.    Defendants had a legal duty to preserve evidence relating to the Nisoor Square massacre.

126.    Defendants intentionally destroyed that evidence.

127.    By so destroying, defendants significantly impaired Plaintiffs' ability to prove critical facts in this action.

128.    Defendants' intent, at least in part, in destroying the evidence was to lessen the risk that they would be found liable by a jury hearing this action.

129.    Defendants' intentional destruction of evidence harmed and continues to harm the Plaintiffs.

**PRAYER FOR DAMAGES**

130.    Plaintiffs and their family members, acting when necessary through their Estates, are entitled to any and all remedies available to them as a result of the conduct alleged herein, including, but not limited to:

(a)    compensatory damages for death, physical, mental and economic injuries;

(b)    punitive damages in an amount sufficient to strip Defendants of all of the revenue and profits earned from their pattern of constant misconduct and callous disregard for human life;

(c)    compensatory and punitive damages sufficient to punish Defendants for their intentional and willful destruction of evidence; and

- 19 -

(d)    any attorneys' fees and costs permitted by law.


Date:  April 25, 2008                    ___/s/ Susan L. Burke _____
                                         Susan L. Burke (D.C. Bar # 414939)
                                         William T.  O'Neil (D.C. Bar # 426107)
                                         Elizabeth M. Burke
                                         Katherine R. Hawkins
                                         BURKE O'NEIL LLC
                                         4112 Station Street
                                         Philadelphia, PA 19127
                                         Telephone:    (215) 971-5058
                                         Facsimile:    (215) 482-0874

                                         Michael A. Ratner
                                         Katherine Gallagher
                                         CENTER FOR CONSTITUTIONAL RIGHTS
                                         666 Broadway, 7th Floor
                                         New York, NY 10012
                                         Telephone:    (212) 614-6455
                                         Facsimile:    (212) 614-6499

                                         Shereef Hadi Akeel
                                         AKEEL & VALENTINE, P.C.
                                         888 West Big Beaver
                                         Suite 910
                                         Troy, MI 48084
                                         Telephone:    (248) 269-9595
                                         Facsimile:    (248) 269-9119
                                         *Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF HIMOUD SAED ABTAN, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | )  Case No. 07-cv-1831 (RBW) |
| v. | ) |
| | ) |
| BLACKWATER WORLDWIDE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**[PROPOSED] ORDER**

Having considered Plaintiffs' motion for leave to amend, it is hereby ORDERED that the motion is granted, and the clerk of court is directed to file the Plaintiffs' Third Amended Complaint.


Dated: _____          _____
                                 The Honorable Reginald B. Walton
                                 United States District Judge